JOURNAL ENTRY AND OPINION
The issue in this appeal is whether a civil temporary protection order should have been issued when the non-custodial father claimed that his ex-wife, the custodial mother, had whipped their child leaving bruises, welts, and other marks. The trial court held the mother's conduct constituted corporal punishment and declined to issue the protection order. Consequently, our standard of review is whether sufficient, credible evidence exists to prove by a preponderance of that evidence that the mother's conduct resulted in an act of domestic violence. See Reynolds v. White (September 23, 1999), Cuyahoga County No. 74506, unreported, citing Felton v. Felton (1997), 79 Ohio St.3d 34,679 N.E.2d 672.
Because we conclude the amount of evidence failed to prove domestic violence, we overrule the following error assigned by the father, appellant David Thompson:
 THE TRIAL COURT ERRED, AS A MATTER OF LAW, IN DISMISSING THE PETITION FOR DOMESTIC VIOLENCE CIVIL PROTECTION ORDER AFTER PETITIONER HAD ESTABLISHED A PRIMA FACIE CASE OF DOMESTIC VIOLENCE.
The facts of this case are not complicated. Appellee Cindy Koontz whipped her son, Christopher, with a belt because he failed to properly bathe himself as she had instructed. David Thompson petitioned the court for a protection order against Cindy Koontz claiming protection for both his sons, Christopher, age 10, and Joshua, age 8. Thompson alleged Koontz, [i]flict[ed] corporal punishment on the children leaving bruises, welts and other makes [sic] on their bodies. The case was later limited to allegations concerning Christopher. In response to Thompson's petition, the trial court issued an ex parte protection order on October 12, 1999 and set the matter for a full evidentiary hearing on October 14, 1999.
At the hearing, Thompson offered four witnesses David Vale, Rachel Miller, Cindy Koontz,[1] and himself. David Vale, principal of the elementary school attended by the children, testified that on October 5, 1999, the school nurse brought Christopher to his office. Vale said the nurse informed him Christopher came to her complaining back side on his rear was hurting and that he had a bruise there. According to Vale, the nurse observed the mark, but did not feel it warranted medical treatment.
Vale testified he also observed the mark. Vale described the mark as being purple and red in color, and solid. Vale said it looked like a bruise a baseball player gets trying to hook slide into base. Vale said he asked Christopher how he received the mark. In response, Christopher explained he lied to his mother about having washed himself properly while taking a bath, so his mother whipped him with a belt. Vale then asked Christopher whether he felt safe going home. Christopher indicated he did.
After talking with Christopher, Vale decided to contact the Department of Human Services. Vale testified he contacts Human Services whenever a child says he feels unsafe going home or when a child has a mark. Although Christopher indicated he felt safe going home, Vale stated he contacted Human Services based on the mark. Vale said he did not feel comfortable with Christopher being removed from the mother's home. However, Vale indicated when in doubt, standard policy is to err on the side of the child.
Rachel Miller, social worker for Human Services, testified she received a priority one assignment on October 5, 1999 regarding Christopher. Miller indicated the hotline worker makes the decision regarding the priority level assigned to a call. She described the nature of the call as an allegation of physical abuse by the mother and that someone noticed a mark on Christopher's leg and below his buttocks. She stated priority one indicates an emergency requiring her to make contact with the child within one hour of the call.
After receiving the assignment, Miller stated she contacted the school and asked them to hold Christopher until she arrived. Miller also stated her supervisor instructed her to contact Christopher's father and have him meet her at the school. Miller indicated she made no attempt to contact Christopher's mother.
Miller testified that Thompson and Koontz were at the school when she arrived to interview Christopher. Miller stated she was given a room so she could talk with Christopher. Miller testified another social worker, and two vice principals sat in the room during questioning. According to Miller, Christopher told her his mother whipped him that morning for lying and left a mark. Christopher described the whipping as consisting of five to six hits with a belt. Christopher indicated his mother had not spanked him in a long, long time and listed the other forms of discipline used by his mother. Miller said the other forms of discipline listed included time-outs and sending the children to their rooms.
Miller testified she spoke with Christopher's mother and step-father. She indicated Christopher's mother admitted disciplining Christopher using a leather strap that morning.
After interviewing the Koontz family, Miller asked if the children could stay with other relatives for the night to provide a cooling-off period. Koontz agreed. Thompson took his two sons to stay in his home and Koontz's sister, Sandy Esmurdocs, took the two girls. Miller stated the case was not high risk enough to warrant contacting a magistrate to ask for custody.
Additionally, Miller testified Human Services held a family meeting the next day to determine how to proceed with the case. Koontz attended the family meeting together with her husband, father, mother, sister and a friend. Thompson, Miller and Miller's supervisor also attended the meeting. Miller testified Human Services did not hold the meeting for the purpose of determining custody issues. The assessment of risk was not high enough to require the child's removal from the mother's home. According to Miller, Thompson agreed with that decision.
Miller classified the case as moderate risk and indicated she decided not to close the case because she believed the family could benefit from what she termed family preservation services offered through her agency. Miller described family preservation services as a social worker visiting the family home to discuss parenting and disciplinary issues and to resolve problems within the family. Miller stated she intended to transfer the case to an ongoing social worker for this purpose.
Koontz testified she normally disciplines Christopher by sending him to his room or taking away privileges. However, she indicated she occasionally spanks her children using a belt. Koontz described the belt as a leather strap with no buckle. She stated the belt was passed onto to her by her father and admitted she keeps the belt for the specific purpose of spanking the children. She testified that October 5, 1999 was the last time she spanked Christopher with a belt. Koontz testified Christopher's spanking consisted of four hits with the belt. Koontz described the incident which precipitated Christopher's spanking as follows:
 I told Christopher to get a shower. He objected, said he didn't want to. Then proceeded to ask if he could get a bath instead and I said yes. Drew his bath. He got on and he got out; and when he got out, the water looked just like it was just ran and I asked him, I said, Christopher, did you wash? He said, yes. I said, Did you use soap? He said, Yes. I said, Which soap did you use? * * * the blue or the white soap? He looked at the soap saw obviously the blue was dry and chose to say he used the white soap.
 I picked up the white soap and it was still stuck to the tub, so it was very dry. I said Christopher, you did not wash. He said he washed. I said Both soaps are dry, you cannot have used soap and washed. So he agreed he did not wash. I asked him why did he lie? I don't recall he said, I don't know or something. I told him, I says, well, you know Christopher, get back in the tub, use the soap and wash and then you have to get a spanking when you get out because you lied.
Koontz further explained since Thompson told Christopher she could not spank him, Christopher has been pushing the limits of continuously misbehaving and lying. Koontz testified she provided the same description of the spanking to the social worker at the school. She acknowledged the children did not go home with her on October 5, 1999, but explained the social worker asked her to be cooperative, so she voluntarily released the boys to their father for the night.
Thompson testified he went to Christopher's school on October 5, 1999, in response to a call from Miller. Thompson said when he arrived at the school; he spoke with Christopher. According to Thompson, Christopher indicated he was scared he was going to get in trouble for telling about getting whipped and felt bad that the whole situation was his fault. Thompson testified he reassured Christopher that everything would be fine. Thompson stated shortly after talking with Christopher, Miller notified him that Joshua and Christopher would be released to his care and Koontz would not attempt to remove the children from his house. Thompson testified he observed a mark on Christopher's rear thigh which was approximately the size of his fist. He described it as purplish black and blue around the sides. Thompson stated he also noticed a bruise on the mid-center of Christopher's back. According to Thompson, Christopher did not want to return to his mother's home and expressed a desire to live with Thompson instead. Thompson admitted telling the boys they could come live with him and to telling Christopher several months prior to the October incident his mother could not spank him.
Following Thompson's testimony, he rested his case in chief. Koontz moved for a dismissal pursuant to Civ.R. 41(B). The court held its ruling on the motion in abeyance, preferring to hear the remaining witnesses in the case.
Koontz presented four witnesses in her case in defense Sandra Lynn Esmurdoc, Kathy Marie Setliff, Terrance Lee Koontz and herself. Esmurdoc, Koontz's sister, and Setlift, Koontz's friend, both testified they attended the family meeting held on October 6, 1999 at Human Services. Both witnesses indicated Thompson stated he did not feel the children were in harms way and that he had no problem with the children returning to their mother's home.
Terrance Koontz, Koontz's husband, testified he attended the October 6, 1999 family meeting. According to Terrance Koontz, Thompson and Cindy Koontz's father argued at the meeting regarding the difference between abuse and discipline. Terrance Koontz indicated Thompson disciplined the children by smacking them upside the head and that Thompson considered that form of discipline preferable to spanking because it did not leave marks. Terrance also testified Thompson agreed to the children returning to stay with their mother following his scheduled visitation period.
Following her husband's testimony, Koontz took the stand as the last defense witness. Koontz testified Thompson admitted Koontz had not abused the children at the October 6, 1999 meeting. Koontz also stated Thompson agreed to having the children returned to her care. Koontz testified, she thought the matter was resolved until the following day when she learned Thompson filed domestic violence charges. According to Koontz, Thompson told her he filed the charges because her father upset him and she refused to give Thompson additional visitation rights with his children.
The defense rested and Thompson took the stand to offer rebuttal testimony. Thompson testified Terrance Koontz, not he, made the remark about smacking the children in the head. Thompson admitted to telling Koontz she could thank her father for Thompson's decision to file domestic violence charges because of his hostility at the meeting the previous day. Thompson also admitted saying he wanted more time with and custody of his children, but added he believed that to be in the best interest of the children. Thompson also indicated Koontz threatened to make his life miserable if she lost her daughters with Terrance Koontz based on Thompson's charges.
At the close of the testimony, Koontz renewed her motion to dismiss the case pursuant to Rule 41(B)(2). In issuing its ruling on the motion the trial court stated:
 There is no question but that there is an overlay of statutory law that comes into play in the determination of whether or not domestic violence has been committed under 3113.31; but there is no other way to interpret the severity of an act involving the discipline of a child and utilization of corporal punishment without the application of the statutes that are involved that define abuse, etcetera.
 The ultimate question that is presented to the court in these cases is a rather difficult question and it becomes a determination of severity, how severe was the use of corporal punishment? What kind of injury was inflicted? Was it life threatening?
 Sometimes there is a very fine line that distinguishes between discipline and the kind of punishment that inflicts the kind of physical harm that creates a medical problem and consequently a psychological problem. * * *
 Although I don't condone any kind of physical force in discipline, I have to conclude that this case does not cross over the line where there was any imminent danger to the child.
In accordance with its ruling, the court granted Koontz's motion. On October 1, 1999, the trial court entered its judgment dismissing the case with costs to Thompson.
In his sole assignment of error, Thompson argues the trial court erred in denying his petition for domestic violence protection order against Koontz. Thompson argues the trial court incorrectly applied the corporal punishment defense. Thompson argues the standard used by the trial court is the one used in criminal domestic violence cases. Additionally, Thompson argues the trial court failed to apply the preponderance of the evidence standard required in civil cases in reaching its decision to deny Thompson's petition for a protection order pursuant to R.C. 3113.31.
R.C. 3113.31 governs the issuance of civil protection orders in cases of domestic violence. To establish a prima facie case under this statute, the petitioner must show the occurrence of one or more of the following acts against another family or household member:
 (a) Attempting to cause or recklessly causing bodily injury;
 (b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 [2903.21.1] or 2911.211 [2911.21.1] of the Revised Code;
 (c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 [2151.03.1] of the Revised Code.
In Felton v. Felton, the Ohio Supreme Court held that in cases of this nature, the degree of proof required to set forth a case is preponderance of the evidence. Preponderance of the evidence is the amount of sufficient and credible evidence needed to establish one or more of the acts of domestic violence as defined in R.C. 3113.31(A)(1).
This court made it clear in Reynolds v. White that in cases involving the issue of whether an order should be issued, the query for us is whether sufficient, credible evidence has been propounded by the party seeking relief. It goes without saying that Thompson showed that his wife had whipped her 10 year-old son who had a bruise and suffered pain. However, he failed to show that her action constituted domestic violence.
Koontz did meet Thompson's evidence with her own, and countervailed by showing that she disciplined her child by using reasonable corporal punishment. The Supreme Court of Ohio has held the common law defense of corporal punishment by a parent has not been abolished by the domestic violence criminal laws. See State v. Suchomski (1991), 58 Ohio St.3d 74,567 N.E.2d 1304. Appellate courts following the lead of Suchomski have held that proper and reasonable parental discipline can be employed by a defendant as an affirmative defense. See State v. Hart (1996),110 Ohio App.3d 250, State v. Hicks (1993), 88 Ohio App.3d 515. We adopt this logic here.
Consequently, the corporal punishment defense may be employed by a parent charged with civil domestic violence. Nothing in R.C. 3113.31
prevents a parent from properly disciplining her child. See State v. Suchomski.
Nevertheless, Thompson argues this conclusion flies in the face of our decision in Reynolds. Reynolds v. White involved a father who attempted to cover up his conduct by instructing his daughter not to tell anyone about the beating. If the daughter needed medical attention, the father's cover-up might have prevented that help. Thus, this court held the evidence sufficient and credible to establish the element of recklessly causing bodily injury. Reynolds v. White, therefore, is different on its facts.
Thompson also argues that we held in Reynolds v. White that corporal punishment is never a defense to civil domestic violence when the charged conduct is recklessness or a threatened force of imminent serious harm. (Emphasis added.) We remain certain that Reynolds v. White concerned the father's attempt to silence the child from reporting the violence. In fact, we said in Reynolds v. White:
 His instruction to Valerie that she should not tell anyone about her injury reflects a conscious awareness that he acted in disregard of the risk that his conduct would result in bodily injury. We believe this evidence would be sufficient to permit the court to find that White recklessly caused bodily injury to Valerie under R.C. 3113.31(A)(1)(a).
Accordingly, we conclude that the reasonable corporal punishment defense may countervail R.C. 3113.31(A)(1)(a)(b) and (c) when a parent has been charged with domestic violence towards a child. Each case should be viewed on a case-by-case basis.
It is ordered that appellee recover of appellant her costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Domestic Relations Division of Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ________________________________ PATRICIA ANN BLACKMON, JUDGE
JOHN T. PATTON, P.J., and MICHAEL J. CORRIGAN, J., CONCUR.
[1] Thompson called Koontz as a hostile witness during his case in chief.